**VIRGINIA:**

## IN THE CIRCUIT COURT FOR THE COUNTY OF ARLINGTON

| | |
|---|---|
| **URBAN STRATEGIES, L.L.C.,**<br>a Virginia limited liability company, | )<br>) |
| | ) |
| *Plaintiff,* | )<br>) **Case No.** |
| **v.** | )<br>) |
| **MATTHEW RUECKERT, KRISTEN BACON,**<br>and **ANGELA JARRETT,** | )<br>)<br>) |
| Serve: | )<br>) |
| | ) |
| Matthew Rueckert<br>2389 Sawyers Pond Drive<br>Johnson City, TN 37604 | )<br>)<br>)<br>) |
| Kristen Bacon<br>213 Allison Ct<br>Piney Flats, TN 37686-4038 | )<br>)<br>)<br>) |
| Angela Jarrett<br>203 W Gilmer Park<br>Johnson City, TN 37604-3888 | )<br>)<br>)<br>) |
| *Defendants.* | )<br>) |

**RECEIVED**

FEB 2 2 2022

PAUL FERGUSON, CLERK
Arlington County Circuit Court
by_____Deputy Clerk

## COMPLAINT

Plaintiff Urban Strategies, L.L.C. ("Plaintiff" or "Company"), by and through its attorneys, file this Complaint for relief against Defendants Matthew Rueckert ("Mr. Rueckert"), Kristen Bacon ("Defendant Bacon"), and Angela Jarrett ("Defendant Jarrett") (collectively, "Defendants"). Plaintiff states as follows:

## INTRODUCTION

1.      Plaintiff brings this suit in response to a conspiracy by Defendants to start a new company and move Plaintiff's entire administrative office to a new company in order to compete

with Plaintiff for federal funding for administration of social programs, all while Defendants were still employed by Plaintiff.  Plaintiff is a mission-driven enterprise that manages an array of initiatives aimed at serving underprivileged and immigrant communities.  Plaintiff's success in administering these initiatives has resulted in the award of multiple grants from the U.S. Government, which carry significant value.  As Plaintiff was finalizing the award of two new federal grants in October 2021, Defendants secretly organized an effort to: (1) form a new company where they could rehire Plaintiff's administrative office team, (2) sign unauthorized and inflated severance packages with each administrative office employee in order to create financial runway for the transition period, (3) terminate each administrative office employee and activate the severance packages, and (4) steal a federal grant opportunity by notifying their federal contacts that a new company with the exact same team is in place and ready to administer the grant.  As a result, Plaintiff lost a roughly four-year grant totaling three hundred twenty-two million dollars ($322,000,000.00).  Plaintiff now seeks relief as a result of Defendants' actions.

## PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff is a Virginia limited liability company with a principal place of business located in Arlington, Virginia.

3.      Defendants are citizens of the State of Tennessee because they are permanent residents of Tennessee.

4.      Defendant Rueckert entered into an oral contract with Plaintiffs on October 12, 2010, in Arlington, VA.  Said contract was both formed in Virginia and services were to be performed in Virginia.

5.     ˙ Defendants were at-will employees of a Virginia company and caused tortious injury by an act or omission to Plaintiff in the Commonwealth of Virginia, accordingly this Court has personal jurisdiction over Defendants in this matter pursuant to Va. Code § 8.01-328.1.

6.     Venue is proper in the Circuit Court of Arlington pursuant to Va. Code § 8.01-262(3) and (4) because Plaintiff's principal place of business is located in Arlington, Virginia, Defendants contracted to perform services for Plaintiff in the Commonwealth of Virginia, and parts of the cause of action arose in Arlington, Virginia.

## FACTUAL ALLEGATIONS

### Background Facts

7.     Plaintiff is a mission-driven enterprise that has been managing social initiatives aimed at serving underprivileged and immigrant communities since the Company's inception in 2003.

8.     Plaintiff manages initiatives in the areas of early child development, youth development, wellness and mental health, maternal child health, leadership development, public health, and residential services.

9.     Since the Company's inception, it has been awarded numerous grants of millions of dollars from the United States Department of Health and Human Services, in particular the Office of Refugee Resettlement ("ORR").

10.     In October 2021, Plaintiff was in the process of finalizing two new federal grants with the Department of Health and Human Services.

11.     The larger of those two grants (the "Trail House Grant") was valued at three hundred and twenty-two million dollars ($322,000,000.00) and issued by ORR. Under the Trail House Grant, the Company would have overseen and managed a five hundred (500) bed facility

3

in El Paso, Texas, which cares for unaccompanied immigrant children and attempts to reunite them with their families by providing around the clock shelter, food, medical care, counseling, and reunification services.

12.     The smaller of the two grants (the "San Benito Grant") was valued at over thirty-six million dollars ($36,000,000.00) and also issued by ORR. Under this grant the Company was to oversee a similar, smaller facility in San Benito, Texas.

13.     Such federal grants do not allow for "profit" in the traditional sense, but ten percent (10%) of the value of the grant would have been allowed to the Company for indirect costs, or capacity building of the organization for future work in the way similar companies would "reinvest" profit. This means the Company stood to gain roughly an annual average of eight million dollars ($8,000,000.00) in additional revenue for the next four years on the Trail House Grant and an annual average of one million eight hundred thousand dollars ($1,800,000.00) in additional revenue for the next two years on the San Benito Grant in annual additional revenue.

14.     As such, the Company was on the cusp of securing the two largest grants in its history, caring for thousands of children in direct line with its mission and vision, and also securing over thirty-five million dollars ($35,000,000.00) in indirect revenue when Defendants sabotaged and attempted to steal the Trail House Grant and San Benito Grant as described below.

*Defendants' Employment with Company*

15.     Mr. Rueckert was hired by Plaintiff on October 12, 2010, as the Company's Chief Financial Officer.  In or about 2015, he was also named Chief Operating Officer.  At the time of the conspiracy, Mr. Rueckert's responsibilities with the Company included managing the administrative office operations of the Company located in Johnson City, Tennessee (including human resources, finance, information technology and payroll) (the "Johnson City Office"),

managing grant applications and administration, and advising the Company's president and sole owner, Lisa Cummins (the "President"), on corporate initiatives and strategic planning. As a part of Mr. Rueckert's responsibilities, he was the main point of contact for the Company's applications for federal grants, including the application for the Trail House Grant.

16.    Defendant Bacon was hired by Mr. Rueckert into the Johnson City Office on February 10, 2020 and at the time of the conspiracy was serving as the Finance Director of the Company.

17.    Defendant Jarrett was hired by Mr. Rueckert into the Johnson City Office on March 2, 2020 and at the time of the conspiracy was serving as the Human Resource Director of the Company.

18.    Defendant Bacon and Defendant Jarrett both reported directly to Mr. Rueckert.

19.    As of October 2021, the Company's Johnson City Office consisted of nine full-time employees, inclusive of Defendants.

*Defendants' Conspiracy to Start a Competing Enterprise and Transfer Plaintiff's Johnson City Office to the Competing Enterprise*

20.    In September 2021, the Company was asked by ORR to apply for the San Benito Grant opportunity, which represented the Company's largest grant opportunity to date.

21.    Upon information and belief, in light of the prospect of the San Benito Grant opportunity, Mr. Rueckert and the other Defendants recognized their own opportunity to use the San Benito Grant as a leverage point to (i) start their own company, (ii) leave *en masse* with the entirety of the Company's Johnson City Office, and (iii) either profit by taking the grant themselves or leave Plaintiff with no other option but to outsource its administrative operations to Defendants'

5

new enterprise if Plaintiff was able to keep the grant, notwithstanding Defendants' best efforts to divert it.

22.    Thus, in late September 2021, as the Company was working on securing the San Benito Grant, the Defendants began working together to form a new company called MWR Solutions Group (bearing the initials of Mr. Rueckert, herein referred to as "MWR Solutions").

23.    Defendants used Company time and resources to conceive of and organize MWR Solutions, brainstorming names for the new company and setting up components of the new business, as evidenced on Exhibits A and B attached to this Complaint.

24.    On September 26, 2021, Mr. Rueckert inquired to the San Benito Grants Management Officer about a "new, stand-alone company" taking over the San Benito Grant, as evidenced by Exhibit C attached to this Complaint.  The San Benito Grants Management Officer declined the request.

25.    During the entire San Benito Grant application process, Mr. Rueckert continually excluded the Company's President from meetings and communications regarding the San Benito Grant, falsely representing to the President that ORR wanted to limit the number of points of contact involved.  This was an abnormal practice at the Company.  Upon information and belief, Mr. Rueckert did this because he did not want the President to be privy to his plans to use the San Benito Grant as an opportunity to launch MWR Solutions.

26.    Shortly thereafter, on October 1, 2021, Mr. Rueckert gave all employees in the Johnson City Office significant, above-market raises without the permission or even the knowledge of the President of the Company.

27.    Prior raises of this nature always involved the President's direct involvement and approval.  Further, Mr. Rueckert gave these raises in spite of the President having expressed serious

concerns directly to Mr. Rueckert on several occasions regarding the performance and fit of certain members of the Johnson City Office, including Defendant Jarrett.

28.     A couple of weeks later, in mid-October, the Company (including Mr. Rueckert) was unexpectedly notified by ORR of the opportunity to apply for the Trail House Grant. An opportunity of this magnitude represented an unprecedented and extraordinary opportunity for the Company.

29.     During October 2021, the Company all but secured the Trail House Grant and was set to begin work in December 2021.

30.     Upon information and belief, Defendants understood this development to enhance their opportunity.  Administration of the Trail House Grant would require a strong administrative office, so moving the Company's Johnson City Office to MWR Solutions would create even more compelling grounds to force the Company into contracting with MWR Solutions; otherwise, the Company would be without an administrative office to perform its core business functions, rendering it unable to finally secure or administer the pending grants.

31.     On or about October 27, 2021, again without the knowledge or permission of the President, Defendants prepared and signed severance agreements with all nine Johnson City Office employees, purporting to offer a total of $889,051.08 in collective payments based on the unauthorized raises each had received less than a month prior. An itemized list of the severance amounts agreed to by Mr. Rueckert and each of the other eight employees of the Johnson City Office in the severance agreements is provided on Exhibit D.  Of the total amount, $390,396.96 was purported to be paid to eight of the employees and $498,654.12 was to be paid to Mr. Rueckert.

32.    Mr. Rueckert countersigned eight of these severance agreements on behalf of the Company.  Thus, without authorization or even informing the President, he purported to promise away a total of $390,396.96 of the Company's money.

33.    Mr. Rueckert and Defendant Bacon signed Defendant Bacon's agreement, purporting to pay her $111,823.76 in severance.

34.    Mr. Rueckert and Defendant Jarrett signed Defendant Jarrett's agreement, purporting to pay her $106,238.96 in severance.

35.    Mr. Rueckert then prepared and signed his own severance agreement on behalf of himself, in which he purported to award himself $498,654.12 in severance.

36.    Defendant Jarrett signed as a witness on the severance agreement prepared by Mr. Rueckert, though Defendants left the Company's signature block blank.

37.    On or about the same day, and without the knowledge or permission of the President, Defendants surreptitiously entered $390,396.96[1] in payments into the Company's payroll system to be paid out to Defendants and the rest of the Johnson City Office staff within the week.

38.    All employees in the Johnson City Office also went into the system and adjusted their respective tax withholdings in expectancy of such payments at the direction of Defendant Jarrett and Defendant Bacon, as evidenced in part on Exhibit E attached to this Complaint.  Upon information and belief, Defendants promised all Johnson City Office employees that such payments would be made the following week.

39.    Late that same afternoon, the President contacted Mr. Rueckert, asking him why he was not present at a scheduled meeting.

---

[1] This number represented the entire amount of severance payments except for the $498,654.12 amount in Mr. Rueckert's proposed agreement.

40.    With no prior notice, the President then received an e-mail from Mr. Rueckert suddenly announcing that he was resigning, effective November 1, 2021, and terminating all of the staff in the Johnson City Office. That e-mail, attached hereto as Exhibit F, failed to mention the severance agreements Mr. Rueckert had already prepared and signed on behalf of the Company or Defendants' apparent intent to re-hire the Johnson City Office under MWR Solutions.

41.    The President immediately attempted to contact other members of the Johnson City Office, including Defendants, but was unable to reach anyone for several hours.

42.    The next evening, Thursday, October 28, 2021, the President flew to Johnson City. When she entered the office the morning of Friday, October 29, she discovered that the office had been emptied, vacated, and almost all Company property had been removed, including physical files, papers, computers, hard drives, laptops and other devices which included trade secrets, client lists, methods of operation, confidential Company information, confidential data, and records ("Plaintiff's Trade Secrets").[2]

43.    That same morning, the President met with Mr. Rueckert, and Mr. Rueckert presented the President with the proposed contract attached hereto as Exhibit G, requesting that the Company enter into a contract with MWR Solutions to outsource Plaintiff's Johnson City Office to MWR Solutions. The President refused. Mr. Rueckert did not mention any severance agreements.

44.    Later that morning, in a subsequent meeting with Mr. Rueckert, the President and her team declined to sign Mr. Rueckert's proposed severance agreement, and then directly asked him whether any other severance payments had been promised to the Johnson City Office employees. Mr. Rueckert did not answer the question and instead changed the subject.

---

[2] Late the next week, after demands of counsel, Defendants, through counsel, returned computers and hard drives and represented that all Company property had been returned.

45.     Finally, late that afternoon, the President demanded that Mr. Rueckert assure the Company that no severance payments were offered. Mr. Rueckert left the room and returned with copies of the aforementioned severance agreements.

46.     These were the severance agreements that Mr. Rueckert prepared for employees in the Johnson City Office, instructed them to sign, and then purported to countersign on behalf of the Company.   The President neither approved nor knew of these severance agreements. The unauthorized and secret severance agreements purported to obligate the Company to pay $390,396.96.

47.     The President informed Mr. Rueckert he was being placed on administrative leave, and that evening she engaged full legal counsel to address the Johnson City Office employees' fraudulent severance agreements and Defendants' brazen breaches of their fiduciary duties to the Company.

48.     In sum, and upon information and belief, in a conspiracy to steal the Company's business, Defendants (i) gave themselves unauthorized raises in early October, (ii) signed unauthorized severance agreements in late October, (iii) collectively fired the entire administrative office right as Plaintiff was on the cusp of securing the two largest contracts in its history.

49.     Upon information and belief, all of these actions represent an organized effort to fund MWR Solutions with the runway of nearly nine hundred thousand dollars ($900,000.00) in severance payments and then force the Company into being the first major contract of MWR Solutions.

50.     When Plaintiff declared that the severance agreements were invalid and also declined to enter into the contract with MWR Solutions, Defendants went a step further.

51.     On October 30, 2021, while on administrative leave but still employed by the Company,[3] Mr. Rueckert sent an e-mail to the Senior Program Officer of ORR and other leadership staff overseeing the transfer of the Trail House Grant to the Company. In that e-mail, he requested that ORR transfer "the Trail House program to MWR Solutions Group." He noted that MWR Solutions' administrative office team that had operated under Urban Strategies "remain[ed] intact under MWR Solutions Group" and noted that "[t]here will also be some familiar staff on the proposed program team" in addition to administrative office staff. In an effort to conceal his efforts, Mr. Rueckert sent this e-mail from his personal e-mail account and did not copy any of Plaintiff's current or former staff. A copy of this e-mail communication is attached to this Complaint as Exhibit H.

52.     On the next business day, November 1, the Senior Program Officer responded to Mr. Rueckert's e-mail, copying Plaintiff's and ORR's respective key staff, and informed him that his request was not possible, as evidenced on Exhibit I attached to this Complaint.

53.     On November 5, the Senior Program Officer informed Plaintiff that because of the Company's recent changes concerning its administrative office staff, ORR was pulling the Trail House Grant opportunity from Plaintiff, as evidenced on Exhibit J attached to this Complaint.

54.     As a direct result of Defendants' conspiracy, Plaintiff lost the opportunity to administer the Trail House Grant.

*Defendants' Aftermath*

55.     In the months following Defendants' conspiracy and departure from the Company, Plaintiff discovered that Defendants had coordinated unauthorized access to the President's e-mails within the Company's IT System and were stealing and circulating her e-mails amongst each

---

[3] According to the e-mail sent by Mr. Rueckert to the President stating his intent to resign, attached hereto as Exhibit F, his intended date of resignation was not until November 1, 2021.

other without the President's knowledge, using subject lines that were intended to go undetected in the Company's e-mail system.

56.     Plaintiff also discovered that while Defendants were still employed by Plaintiff, Defendants used multiple Company communication channels and off-site meetings to plan the actions described in this Complaint.

57.     Plaintiff has spent and must continue to spend significant amounts to address the fallout of Defendants' actions described in this Complaint.

## COUNT I – Breach of Contract

58.     The allegations of Paragraphs 1 through 57 are incorporated herein by reference with the same force and effect as if set forth in full below.

59.     Defendants were employed by Company by virtue of respective oral contracts for at-will employment (the "Employment Agreements").

60.     Defendants' Employment Agreements each carried an implied duty of good faith and fair dealing owed by Defendants to Company.

61.     During their employment with Plaintiff, Defendants conspired to give themselves raises without the knowledge or approval of the President of the Company.

62.     During their employment with Plaintiff, Defendants conspired to give themselves inflated severance agreements without knowledge or approval of the President of the Company.

63.     During their employment with Plaintiff, Defendants used Company time and resources to plan and create MWR Solutions which they intended to use to compete with the Company.

64.    During their employment with Plaintiff, Defendants took steps to interfere with the award of the San Benito Grant and the Trail House Grants to Plaintiff in an effort to redirect such grants to MWR Solutions.

65.    These actions by Defendants, performed in the scope of their employment with the Company, were dishonest, arbitrary, and unfair to the Company.

66.    Defendants have thus breached their implied duties of good faith and fair dealing owed to the Company.

67.    Defendants' actions damaged Plaintiff in an amount to be determined at trial.

## COUNT II – Misappropriation of Trade Secrets

68.    The allegations of Paragraphs 1 through 67 are incorporated herein by reference with the same force and effect as if set forth in full below.

69.    Plaintiff's Trade Secrets are trade secrets of Plaintiff subject to protection under Virginia law.

70.    Plaintiff's Trade Secrets derive independent economic value by not being accessible, through proper means, to competitors such as Defendants, who can profit from its use or disclosure.  Plaintiff has made a significant investment, in terms of both financial and human resources, to develop and maintain this information, which is of great value to any competitor.

71.    Plaintiff has taken more than reasonable and adequate measures under the circumstances to maintain the secrecy of this information, including assigning computer-access passwords to be used to access Company computer systems and records, restricting access to its business premises, publishing express policies prohibiting the disclosure of confidential information during and after employment, and having employees.

13

72.    Defendants' conduct as described herein constitutes actual and threatened misappropriation of Plaintiff's Trade Secrets in violation of Virginia law.

73.    Defendants' actions damaged Plaintiff in an amount to be determined at trial.

74.    Defendants have acted willfully and maliciously in misappropriating Plaintiff's Trade Secrets warranting punitive damages in an amount not to exceed twice any award for damages or $350,000.

**COUNT III – Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.***

75.    The allegations of Paragraphs 1 through 74 are incorporated herein by reference with the same force and effect as if set forth in full below.

76.    During Defendants' employment, they were provided access to and did in fact receive and review Plaintiff's Trade Secrets.

77.    Such information has been assembled and compiled by Plaintiff at considerable expense, is maintained in confidence, and is of considerable independent economic value because it is not available to Plaintiff's competitors.

78.    Plaintiff has made reasonable efforts to preserve the confidentiality and secrecy of such information.

79.    The information identified in the preceding paragraphs consists in whole or in part of trade secrets defined by the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et. seq.*

80.    Upon information and belief, Defendants improperly used and/or disclosed Plaintiff's Trade Secrets in an unauthorized manner for their own benefit.

81.    Defendants' actions constitute misappropriation of trade secrets under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et. seq.*

82.    Defendants' actions damaged Plaintiff in an amount to be determined at trial.

## COUNT IV – Breach of Fiduciary Duty

83.    The allegations of Paragraphs 1 through 82 are incorporated herein by reference with the same force and effect as if set forth in full below.

84.    Defendants had a common law duty of loyalty arising as a result of their relationship as an employee, agent and/or representative of Plaintiff.

85.    Defendants had a confidential relationship with Plaintiff.

86.    During their employment with Plaintiff, Defendants conspired to give themselves raises without the knowledge or approval of the President of the Company.

87.    During their employment with Plaintiff, Defendants conspired to give themselves inflated severance agreements without knowledge or approval of the President of the Company.

88.    During their employment with Plaintiff, Defendants used Company time and resources to plan and create MWR Solutions which they intended to use to compete with the Company.

89.    During their employment with Plaintiff, Defendants took steps to interfere with the award of the San Benito Grant and the Trail House Grants to Plaintiff in an effort to redirect such grants to MWR Solutions.

90.    Defendants' actions as described herein constitute a violation of Defendants' duty of loyalty to Plaintiff.

91.    Defendants' actions damaged Plaintiff in an amount to be determined at trial.

92.    Defendants have acted willfully and maliciously in breach of their fiduciary duties warranting punitive damages in an amount not to exceed $350,000.

15

## COUNT V – Tortious Interference with Contract and Business Expectancy

93.    The allegations of Paragraphs 1 through 92 are incorporated herein by reference with the same force and effect as if set forth below.

94.    Plaintiff had a clear business relationship with the ORR and was on the cusp of closing the Trail House Grant.

95.    Defendants were aware of these relationships and were aware of the expected receipt of the Trail House Grant.

96.    Defendants purposefully intended to interfere with Plaintiff's relationships with the ORR and their actions as alleged herein did, in fact, interfere with such relationships by improper means.

97.    Defendants improperly interfered with Plaintiff's business relationships by breaching their fiduciary duties through the misappropriation of confidential and trade secret information.

98.    Defendants' actions impaired, or will impair, the Plaintiff's business relationships with the ORR, including Plaintiff's loss of the Trail House Grant.

99.    Defendants' actions damaged Plaintiff in an amount to be determined at trial.

100.    Defendants have acted willfully and maliciously in tortiously interfering with Plaintiff's contracts and business expectancies warranting punitive damages in an amount not to exceed $350,000.

## COUNT VI – Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030

101.    The allegations of Paragraphs 1 through 100 are incorporated herein by reference with the same force and effect as if set forth below.

102.    The Computer Fraud and Abuse Act ("CFAA") protects employers who have been injured by the wrongful access of a protected computer by an individual without authorization or in excess of his authorization.

103.    Defendants accessed a protected computer outside of authorized purposes when they worked together to have Defendant Bacon intercept the e-mail correspondence of the Company's President, and then distribute such e-mails among the Defendants, for the purpose of, upon information and belief, using it to further their conspiracy.

104.    Defendants' actions as alleged herein violate the CFAA.

105.    Defendants' actions damaged Plaintiff in an amount to be determined at trial.

### COUNT VII – Violation of the Virginia Computer Crimes Act,
### Va. Code §§ 18.2-152.3, 18.2-152.4(6), 18.2-152.12

106.    The allegations of Paragraphs 1 through 105 are incorporated herein by reference with the same force and effect as if set forth below.

107.    Similar to the CFAA, the Virginia Computer Crimes Act also protects employers injured by employees who have accessed a computer to obtain property without authorization.

108.    Defendants, with malicious intent and through intentionally deceptive means and without authority, accessed a protected computer outside of authorized purposes when Defendant Bacon intercepted and copied the e-mail correspondence of the Company's President, and subsequently distributed such e-mail correspondence among the Defendants, for the purpose of, upon information and belief, using it to further their conspiracy.

109.    Defendants took these actions under the false pretense of acting on behalf of the Company.

110.    These actions violate the Virginia Computer Crimes Act.

17

111.    Defendants' actions damaged Plaintiff in an amount to be determined at trial.

## COUNT VIII - Fraud

112.    The allegations of Paragraphs 1 through 111 are incorporated herein by reference with the same force and effect as if set forth below.

113.    Defendants represented to the President that their actions performed during their employment with Company were performed for the sole benefit of the Company.

114.    Specifically, Mr. Rueckert partook directly in the Company's application process for the Trail House Grant, during which he represented to the Company, including the Company's President, that his aim was for the Company to be awarded the grant.

115.    Mr. Rueckert falsely represented to the President that ORR wished to minimize the number of points of contact involved in their communications.

116.    The President relied on Mr. Rueckert's efforts, supported by the other Defendants, including Mr. Rueckert's false representation that ORR wished to minimize its points of contact with Company in connection with the Trail House Grant, and thus the President removed herself from such communications.

117.    The Company was damaged as a result of the President relying on Mr. Rueckert's false representation by being excluded from communications with ORR related to the Trail Head Grant and enabling Mr. Rueckert an exclusive line of communication with ORR, which he attempted to use to divert the grant to MWR Solutions.

118.    The Company was damaged in light of losing the Trail House Grant in reliance on Mr. Rueckert.

119.    As described herein, Defendants knowingly and intentionally mislead the Company with respect to that material fact, in light of their efforts to create MWR Solutions with the intent

18

to move the Company's Johnson City Office to MWR Solutions and compete for the Trail House Grant.

120.    Plaintiff was ultimately not awarded the Trail House Grant due to Defendants' actions.

121.    Defendants' actions damaged Plaintiff in an amount to be determined at trial.

**COUNT IX – Statutory Business Conspiracy in Violation of Va. Code §§ 18.2-499, 18.2-500**

122.    The allegations of Paragraphs 1 through 121 are incorporated herein by reference with the same force and effect as if set forth below.

123.    Defendants conspired to willfully and maliciously harm Plaintiffs' reputation, trade business,  and profession by inducing breaches of fiduciary duties, tortiously interfering with Plaintiff's contracts and business relationships, and misappropriating and using Plaintiff's Trade Secrets.

124.    Defendants' actions damaged Plaintiff in an amount to be determined at trial, but in any event no less than $32,000,000.00.

**COUNT X – Conspiracy**

125.    The allegations of Paragraphs 1 through 124 are incorporated herein by reference with the same force and effect as if set forth below.

126.    Defendants conspired together to (i) induce the breaches of fiduciary duties, (ii) tortiously interfere with Plaintiff's contracts and business relationships as described above, (iii) misappropriate and use Plaintiff's Trade Secrets; and (iv) commit fraud.

127.    Defendants engaged in wrongful acts to accomplish the fruits of their conspiracy and, as a direct and proximate result of the foregoing, Plaintiff has suffered and will continue to suffer damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court grant it the following relief:

1.     Award Plaintiff damages for loss of the Trail House Grant in the amount of $32,000,000.00;

2.     Award Plaintiff damages for Defendants' preparation and purported execution of the unauthorized severance agreements in the amount of $390,396.96;

3.     Award Plaintiff punitive damages in the amount of $350,000.00;

4.     Order Defendants to pay treble damages pursuant to Va. Code § 18.2-500;

5.     Order Defendants to pay attorneys' fees pursuant to Va. Code § 18.2-500;

6.     Award such other and further relief to Plaintiff as this Court deems just and proper.

Trial by jury is hereby demanded.

Dated: February 22, 2022                    Respectfully submitted,

_____
Justin Whitmel Earley (VSB No. 87489)
Andrew E. Hemby (VSB No. 93556)
The Earley Legal Group
303 W Broad St, Unit 307
Richmond, Virginia 23220
Telephone:  (571) 926-6033
justin@earleylegalgroup.com
andrew.hemby@earleylegalgroup.com

David G. Boyce (VSB No. 76524)
Boyce PLC
P.O. Box 5405
Richmond, Virginia 23220
Telephone:  (804) 551-9210
david@boyceplc.com

*Counsel for Plaintiff Urban Strategies, L.L.C.*

20

## <u>EXHIBIT A</u>

**Microsoft Teams conversation between employee and Defendant Jarrett**

9/28, 11:12 AM
**MWR Consortium**

9/28, 11:21 AM
hey can you send me the open positions list as well please


**Brianna Reece** 9/28, 11:29 AM
Network?

9/28, 11:29 AM
taken already


**Brianna Reece** 9/28, 11:51 AM
MWR Centralized solutions?

9/28, 11:52 AM
writing it on the board


**Brianna Reece** 9/28, 11:55 AM
MWR Core Performance Group

9/28, 11:55 AM
dang running a marathon


**Brianna Reece** 9/28, 11:55 AM
Lol

## EXHIBIT B

**Matt Rueckert**

| | |
|---|---|
| From: | Matt Rueckert |
| Sent: | Wednesday, September 29, 2021 4:42 PM |
| To: | Angela Jarrett; Paul Roussel |
| Cc: | Kristen Bacon |
| Subject: | RE: FEIN and Address |

Categories:                    JC

Kristen, here's what I'm thinking –

- General liability
- Professional liability
- Management liability
- Umbrella
- Cyber
- WC

Anything else?

**From:** Angela Jarrett <ajarrett@urbanstrategies.us>
**Sent:** Wednesday, September 29, 2021 5:32 PM
**To:** Paul Roussel <proussel@bbtennessee.com>
**Cc:** Matt Rueckert <mrueckert@urbanstrategies.us>; Kristen Bacon <kbacon@urbanstrategies.us>
**Subject:** FEIN and Address

Hi Paul,

Thank you for reaching out this evening. Below is the FEIN and Address you asked for.  Also I have copied Matt and Kristen on this email as well.  Kristen can you give Paul a list of the business insurances we need?

- : Legal Business Name: **MWR Solutions Group**
- : Business Address: **200 E. Main St., Suite 600, Johnson City, TN  37604**
- : Federal Tax ID Number (EIN):
- : Type of Business (S-Corp, LLC, Non-Profit, etc.): **S-Corp**
- : State and Date Business was started/incorporated in:  **TN, 09/28/2021**

*Urban* STRATEGIES

**Angela Jarrett, MBA**
Human Resources Director
423.534.4757
ajarrett@urbanstrategies.us
www.urbanstrategies.us |
Subscribe

## EXHIBIT C

## Matt Rueckert

| | |
|---|---|
| **From:** | Matt Rueckert |
| **Sent:** | Sunday, September 26, 2021 5:12 PM |
| **To:** | Code, Karen (ACF) |
| **Cc:** | Leal, Bernadette (ACF); Viola, Sarah (ACF) |
| **Subject:** | Re: Grant Transfer Opportunity - Urban Strategies |
| | |
| **Categories:** | JC |

Karen,  thanks for closing the loop on this question.

Matt

Sent from my mobile device

**From:** Code, Karen (ACF) <Karen.Code@ACF.hhs.gov>
**Sent:** Sunday, September 26, 2021 11:03:37 AM
**To:** Matt Rueckert <mrueckert@urbanstrategies.us>
**Cc:** Leal, Bernadette (ACF) <Bernadette.Martinez@acf.hhs.gov>; Viola, Sarah (ACF) <Sarah.Viola@acf.hhs.gov>
**Subject:** RE: Grant Transfer Opportunity - Urban Strategies

Good morning Matt:

In consideration of regulatory, policy and expediency parameters, ACF determined that moving forward to confirm the identified replacement recipients of the CHS grants is the best course of action. ACF is not considering the option that you describe below.

Thank you,

Karen

Karen Code, MPA
Grants Management Officer
Office of Grants Management
Administration for Children and Families
Department of Health and Human Services
Mary E. Switzer Building, 330 C Street SW Washington DC  20201-0001
Desk:  202-401-6888

**From:** Matt Rueckert <mrueckert@urbanstrategies.us>
**Sent:** Sunday, September 26, 2021 10:29 AM
**To:** Code, Karen (ACF) <Karen.Code@ACF.hhs.gov>; Leal, Bernadette (ACF) <Bernadette.Martinez@acf.hhs.gov>
**Subject:** Fwd: Grant Transfer Opportunity

Karen and Bernadette, good morning.

Based on our Thursday conf call, I've been thinking about options to maintain the continuity of services & staffing under the existing CHS ORR division but under a new, stand-alone company.

If Caliburn is peeling away the entire CHS ORR division, would ORR consider novating the agreement(s) if another company acquired this division?  This includes CHS Regional Program Office as referenced in CHS's budget.  I'm making the assumption that Caliburn has no intentions in keeping any of these staff after November 30.  What I'm proposing would keep all 6 locations as-is, including the Regional Program Office.  The only difference is that they would fall under the new organization and new leadership.

What I'm proposing would require discussions with Caliburn and ORR's approval since this would be what i would call a carve-out transaction.

Thoughts?  Is this an option?

Thanks,

Matt



Sent from my mobile device

---

**From:** Matt Rueckert <mrueckert@urbanstrategies.us>
**Sent:** Friday, September 24, 2021, 2:52 PM
**To:** Viola, Sarah (ACF); Umana, Johanna (ACF); Jacobs Gainor, Rachel (ACF); Scroggins, Gerald (ACF); Leal, Bernadette (ACF); Code, Karen (ACF); Walters, Michele (ACF); Leo, Elizabeth (Beth) (ACF); Chamberlain, Brenda (ACF)
**Cc:** White, Anita (ACF)
**Subject:** RE: Grant Transfer Opportunity


ORR Team –

Thanks again for reaching out regarding the CHS San Benito Shelter.

I've spoken with Carla LaFayette, who oversees our ORR programs, and she is in agreement with continuing these discussions with ORR.  We're very much interested in making this happen.

For next steps, we would like to know when we can schedule a site visit with CHS at their San Benito Center.  We can make this happen next week (Wednesday or Thursday) or if next week is not an option, we can schedule it during the week of October 4.  Please advise on next steps.

In the meantime, I have a question on the possibility of transferring all of CHS's ORR programs under 1 entity through a novation agreement.  While at another organization many years ago, I did this on several DHS contracts under FAR subpart 42.12, but I have not explored this option under a federal grant.  Is this an option if ORR considers it in the best interest of the government and if CHS is open to transferring all assets associated with the 6 Centers noted below?   Is there an anti-assignment/change of control clause in the agreement?

- San Benito Shelter = 100

- **Trail House Shelter = 512**
- **Loma Alta Shelter = 76**
- **Casa Norma Linda = 338**
- **Stanford House = 416**
- **Los Fresnos = 144**

Lastly, here are some additional comments/questions I have w/ what is being proposed --

- **Develop transition for continuity of services.**
- **Staff notification -- Have staff been notified of the grant relinquishment?**
- **Assets -- Will assets at the Center remain, e.g., all assets necessary to perform the program services?**
- **Vendor accounts -- Will need to look at all accounts (vendors, contractors, suppliers, subscriptions, fleet mgmt., etc.) that are linked to CHS to be transferred.**
- **Program related files - Securing and transferring all cloud-based files associated with the ORR program.**
- **Email transition from CHS -- forwarding emails until ALL emails sent to legacy addresses are transitioned to the new email account. Email history backup.**
- **Identification of Transition Mgr.**
- **Admin teams at both organizations have to support each other to ensure a seamless, smooth, and rapid transition.**
- **Discuss transition of services & staff from CHS**
- **Conduct a series of assessment activities to plan for most effectively liaising with current employees & establishing a transition roadmap for moving forward with the program & transferring of staff under the new structure.**
- **Communicate non-displacement clause w/ existing staff**
- **Issue offer letters to staff and per the to be written non-displacement clause, give staff 5 days to accept the offer.**
- **During the first 90 days of program launch, we will evaluate the performance of each staff.**
- **Given that we intend to hire CHS staff, we do not anticipate the need to conduct program-wide training; however, any staff hired during this transition period or upon execution of the agreement, will meet all applicable qualifications & training requirements as outlined in the cooperative agreement.**

Thanks,
Matt


-----Original Appointment-----
**From:** Viola, Sarah (ACF) <Sarah.Viola@acf.hhs.gov>
**Sent:** Tuesday, September 21, 2021 9:47 AM
**To:** Viola, Sarah (ACF); Matt Rueckert; Umana, Johanna (ACF); Jacobs Gainor, Rachel (ACF); Scroggins, Gerald (ACF); Leal, Bernadette (ACF); Code, Karen (ACF); Walters, Michele (ACF); Leo, Elizabeth (Beth) (ACF); Chamberlain, Brenda (ACF)
**Cc:** White, Anita (ACF)
**Subject:** Grant Transfer Opportunity
**When:** Thursday, September 23, 2021 2:00 PM-2:30 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Microsoft Teams Meeting

Good morning! The purpose of the meeting is to discuss an opportunity to take over an existing grant through a grant transfer process. The existing grant is in good standing with the federal government and the grantee has decided to relinquish prior to the end of the grant period

Thank you
Sarah

**EXHIBIT D**

| Employee | Severance Agreement |
|---|---|
| Rueckert, Matthew W. | $ 498,654.12 |
| Jarrett, Angela M. | $ 106,238.96 |
| Bacon, Kristen R. | $ 111,823.76 |
| Gillenwater, Ashlynn | $ 20,429.96 |
| Lasalle, Nicolle | $ 30,077.06 |
| Reece, Brianna | $ 33,131.67 |
| Adams, Daniel | $ 33,976.67 |
| Gil, Teresa | $ 27,575.86 |
| Valencia, Salvador | $ 27,143.02 |
| **Severence Totals** | **$ 889,051.08** |

## EXHIBIT E

Microsoft Teams conversation between employee and Defendant Jarrett

Thursday, October 28, 2021

10/28/2021 10:43 AM

Hey! Has Kristen talked with you about your taxes for the severance? Right now, it is showing your taxes for Federal would be $8968.64 for the severance. If you want to change please go in paycor and change. I did mine as a flat amount, let me know if you need help.

Teresa Gill  10/28/2021 10:44 AM
thank you! Is this going to be on our next/last check?

10/28/2021 10:49 AM
we are working on maybe doing a payrun just for severance.

10/28/2021 1:33 PM
$8968.64 is the amount of federal taxes coming out of your severance, just making sure you are ok with this?

Teresa Gill  10/28/2021 2:57 PM
is that based on my withholding in paycor? I assume it's correct. I'm going to owe more based on my condo sale anyways. so I'll probably owe additional

10/28/2021 2:57 PM
yes.

**EXHIBIT F**

**From:** Matt Rueckert <mrueckert@urbanstrategies.us>
**Sent:** Wednesday, October 27, 2021 4:26:01 PM
**To:** Lisa Cummins <lisacummins@urbanstrategies.us>
**Cc:** Angela Jarrett <ajarrett@urbanstrategies.us>
**Subject:** Letter of Resignation & Separation Agreement

Lisa, attached is my resignation letter and separation & release agreement, effective November 1.

In addition, I will be terminating the following Johnson City staff, effective November 1 –

- Kristen Bacon
- Angie Jarrett
- Dan Adams
- Teresa Gill
- Ashlynn Gillenwater
- Nicolle Lasalle
- Brianna Reece
- Sal Valencia

Please note, prior to shutting down the Johnson City office, the staff will ensure that the following is completed –

- Payroll for the period ending 10/29
- Financial drawdown for costs incurred on all federal programs
- Revise and resubmit San Benito and Trail House budgets based on negotiations that occurred with ORR this afternoon.
- Submit CTRs/FFRs for all federal programs
- Close-out ORR Year 2
- Release all invoices for services rendered during the month of October
- Run AP

If you should have any questions or would like to discuss, I will be in the office tomorrow and Friday.  Due to a previously scheduled call with the AbleWorks Team, I will not be able to join the 5PM EST call.

Thanks,
Matt

This message, including attachments, is confidential and privileged material and is for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items. Please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and any copies thereof.

Este mensaje, incluidos los archivos adjuntos, es material confidencial y privilegiado y es para uso exclusivo del destinatario previsto. El uso o distribución por parte de un destinatario no deseado está prohibido y puede ser una violación de la ley. Si cree que recibió este correo electrónico por error, no lo lea ni ningún elemento adjunto. Elimine el correo electrónico y todos los archivos adjuntos, incluidas las copias de los mismos, e informe al remitente que ha eliminado el correo electrónico, todos los archivos adjuntos y cualquier copia de los mismos.

This message, including attachments, is confidential and privileged material and is for the sole use of the intended recipient. Use or distribution by an unintended recipient is prohibited and may be a violation of law. If you believe that you received this e-mail in error, please do not read this e-mail or any attached items. Please delete the e-mail and all attachments, including any copies thereof, and inform the sender that you have deleted the e-mail, all attachments and any copies thereof.

Este mensaje, incluidos los archivos adjuntos, es material confidencial y privilegiado y es para uso exclusivo del destinatario previsto. El uso o distribución por parte de un destinatario no deseado está prohibido y puede ser una violación de la ley. Si cree que recibió este correo electrónico por error, no lo lea ni ningún elemento adjunto. Elimine el correo electrónico y todos los archivos adjuntos, incluidas las copias de los mismos, e informe al remitente que ha eliminado el correo electrónico, todos los archivos adjuntos y cualquier copia de los mismos.

October 27, 2021

Lisa Trevino Cummins
President & Founder
Urban Strategies, LLC
2341 9th Street S.
Arlington, VA 22204

Dear Lisa:

After 11 years as CFO/EVP at Urban Strategies, it is my sincere regret that I am compelled to submit my resignation as an officer and employee of Urban Strategies, to take effect November 1, 2021.

I gave a lot to this organization, but I have to strike a balance between the work and my personal life. I would love to keep going since there's so much still left to be completed, but it's time. It's been a whirlwind of truly amazing experiences -- the growth of the organization, the growth of our programs, and overall impact we are having with children and families, and in the communities we serve. We are changing the human condition.

I feel my association with the organization over the past 11 years has been a good one and I will miss the many friends and colleagues I have worked with here. It's been a privilege, nothing less. I have worked with the best of the best.

I wish the entire organization the best of luck for continued success.

Respectfully submitted,

Matt Rueckert

cc:    Angie Jarrett

## EXHIBIT G

Company: MWR Solutions Group Corp ("Company")
Company Address:   200 E. Main St., Suite 600, Johnson City, TN 37604
Client Name:  Urban Strategies, LLC ("Client")
Client Address:  2341 9th Street S., Arlington, VA  22204
Effective Date:  11/1/2021 ("Effective Date")

This Service Level Agreement ("SLA" or "Agreement") by and between Urban Strategies, LLC, herein referred to as Client, and MWR Solutions Group Corp, hereinafter referred to as Service Provider, each as identified above and located at the indicated addresses, is effective as of the date specified above.  Additionally, this Agreement will not supersede any current processes, procedures or agreements unless stated explicitly herein.

WHEREAS, Service provider is a provider of Finance, Accounting, Human Resources, Information Technology, Legal, and Contracts Services Solutions;

WHEREAS, Client desires to contract with Service Provider for the provision of the Service Provider Information.

NOW THEREFORE, for and in consideration of the premises contained herein and good and valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

# Period of Service and Automatic Renewal

This Agreement shall be effective as of the date of this Agreement, execution by CLIENT unless sooner terminated in accordance with the terms hereof, and shall be for an initial term of thirty six (36) months at pricing consistent with rates established in section 1.0 coverage summary. Client and Service Provider reserve the right to review this agreement quarterly and assess its success.  Any necessary changes to the term predicated upon the number of new awards and employees will be made to agreement Addendums as needed and represented by addendum. This Agreement shall renew automatically at the end of the prior Agreement term for another term of thirty-six (36) months unless Service Provider or the Client affirmatively terminates it in accordance with the conditions set forth in this Agreement.  Renewal pricing will remain consistent with rates established in section 1.0 Coverage Summary.

# Modification or Termination of Agreement

The Service Provider reserves the right to renegotiate rates based on additions of locations and employees, as well as modify this Agreement (or any portion thereof) with a thirty (30) day notice.  The Client may request, in writing to the Service Provider, modifications to this agreement (or any portion thereof). The Service Provider will implement any reasonable requested modifications within 30 days of receiving such written request from the Client.

The Service Provider reserves the right to refuse or suspend service under this Agreement in the event CLIENT has failed to pay any invoice within thirty (30) days of said invoice date, whether it be an invoice for services provided under this Agreement or any other agreement between the parties.

This Agreement may be terminated by the Client upon ninety (90) day's written notice if the other Party:

      I.    Fails to fulfill in any material respect its obligations under this Agreement and does not cure such failure

2

                within ninety (90) days of receipt of such written notice.

  II.    Breaches any material term or condition of this Agreement and fails to remedy such breach within ninety (90) days of receipt of such written notice.

  III.   Terminates or suspends its business operations, unless it is succeeded by a permitted assignee under this Agreement.

If either party terminates this Agreement, Service Provider will assist Client in the orderly termination of services, including timely transfer of services to another designated provider. Service Provider acknowledges that all Client data and information is the sole property of the Client. If this agreement is terminated, all Client data and information will be returned to the Client in a usable format.

# Terms of Service

This Agreement shall be governed by the laws of the State of Tennessee. It constitutes the entire Agreement between Client and Service Provider. The parties hereto expressly assume an obligation to act in good faith toward one another in the performance of their obligations under this Agreement. The Service Provider is not responsible for failure to render services due to circumstances beyond its control including, but not limited to, acts of God.

Client agrees that during the term of this Agreement and for a period of one year following the termination of this Agreement, the Client will not recruit or hire any employee, agent, representative or subcontractor of The Service Provider, nor will the Client directly or indirectly contact or communicate with the Service Provider's Personnel for the purpose of soliciting or inducing such Personnel (a) to accept employment with, or perform work for any person, firm, or entity other than the Service Provider; or (b) to provide services to the Client or any other person, firm or entity except as an employee or representative of the Client.

# Confidentiality & Non-Disclosure

The Service Provider and its agents may use Client information, as necessary to or consistent with providing the contracted services. Service Provider acknowledges that through its relationship with Client, service provider may become aware of Confidential Information or trade secrets proprietary to Client. Service Provider agrees to protect and not to disclose or otherwise make available Client's Confidential Information and/or trade secrets. Service Provider shall take appropriate action by instruction, agreement, or otherwise with any respect to Service Provider's employees who are permitted to access Client's Confidential Information and trade secrets. In order to fulfill Service Provider's duties and responsibilities of maintaining network security and confidentiality, administrative passwords will be retained by Service Provider and not released to third parties without written consent from the Client.

Confidential Information shall mean information, whether oral or written (including information provided in electronic format), provided by Client, or received by Service Provider by virtue of the relationship created from this Agreement, provided that such information shall not be Confidential Information if the information provided (i) is known to the trade or public at the time of its disclosure, (ii) becomes generally available to the trade or public other than as a result of MWR Solutions Group Corp, (iii) was in the possession of Service Provider in a non-confidential basis prior to its disclosure, (iv) was disclosed to Service Provider by a third party not reasonably known by Service Provider to be under an obligation of confidentiality, (v) was disclosed pursuant to a legal or regulatory requirement, or (vi) was disclosed with the written consent of Client.

2

3

# 1.0 Coverage Summary
To be developed collaboratively based on the number of employees and locations.

# 2.0 Client Responsibilities

## 2.1 General Responsibilities
To be developed

# 3.0 Service Provider Responsibilities

## 3.1 General Responsibilities
To be developed

# 4.0 Monthly Charges, Fees, and Payment

## 4.1 Monthly Service Charges

Client is purchasing the Service Provider's Services under this Agreement for the charges and fees outlined in Section 1.0 Coverage Summary. Said charges shall be invoiced by the Service Provider and paid in monthly installments by the Client with the first installment due upon execution of this agreement. Each payment thereafter shall be due the first day of each calendar month, with payment expected within 5 days following the due date. Any additional billing charges will be invoiced at the end of each month, with payment expected within thirty (30) days, unless otherwise specified by the Service Provider.

## 4.2 Invoice and Payment

The Service Provider will invoice the Client for covered service charges due in accordance to the terms and conditions defined within this Agreement on the first (1st) of the month, with payment executed five (5) days following the due date and processed via automatic clearing house (ACH) transaction. Any additional billing charges will be invoiced at the end of each month, with payment expected within fifteen (15) days, unless otherwise specified by the Service Provider.

## 4.3 Out of Scope Service Fees

It is understood and agreed upon that any and all Services requested by the Client that fall outside the terms of this Agreement will be considered Projects, and will be quoted and billed as separate, individual Services.

4

# 5.0 Acceptance

This Service Agreement covers all Client locations, including the ORR expansion in San Benito and El Paso, Texas.

IN WITNESS WHEREOF, the parties hereto have caused this Service Level Agreement to be signed by their duly authorized representatives as of the date set forth below.

Accepted by:

| MWR Solutions Group, Corp (Service Provider) | Urban Strategies, LLC (Client) |
|---|---|
| Signature: | Signature: |
| Printed Name: Matt Rueckert | Printed Name: Lisa Cummins |
| Title: CEO | Title: CEO |
| Date: | Date: |

4

## EXHIBIT H

**From:** Matt Rueckert <matthew.rueckert@gmail.com>
**Sent:** Saturday, October 30, 2021 6:41 PM
**To:** Viola, Sarah (ACF) <Sarah.Viola@acf.hhs.gov>
**Cc:** Umana, Johanna (ACF) <Johanna.Umana@acf.hhs.gov>; Gulbrandson, Jennifer (ACF) <Jennifer.Gulbrandson@acf.hhs.gov>; Leal, Bernadette (ACF) <Bernadette.Martinez@acf.hhs.gov>; Code, Karen (ACF) <Karen.Code@ACF.hhs.gov>; Jacobs Gainor, Rachel (ACF) <Rachel.Jacobs@acf.hhs.gov>
**Subject:** RE: CHS Transfer Check In

Sarah,

I am emailing you for 2 reasons --

First, to let you know that I resigned as EVP/CFO at Urban Strategies after 11 years. My new position rests with MWR Solutions Group as the CEO.

Second, to take a pulse to see if ORR would consider transferring the Trail House program to MWR Solutions Group. The administrative team that started the transition with CHS remains intact under MWR Solutions Group. This is a strong and talented administrative team, which Trail House needs, that are fully on board and excited at the possibility of working with the Trail House program. There will also be some familiar staff on the proposed program team.

My commitment to ORR remains the same - a full transition of services from CHS by 1 December. My staff will be fully dedicated to this effort during the month of November and we'll make sure that there are no gaps in services. If acceptable by ORR, we will continue to proceed with the roadmap moving forward with the "transition in" tasks associated with Staffing, HR, CBA, Communications, Leases, IT, Vendors, etc. In order to continue with the on-site transition teams during the period of November 8-30, would ORR consider this proposal? If yes, I would only need a day to finalize and submit the Trail House application for review. As a footnote, the budget can be revised with a focus on maximizing tender age.

I understand there are hurdles that have to be cleared based on what I'm proposing but it's worth the ask.

I appreciate your consideration.

Thanks,
Matt

## EXHIBIT I

**From:** Viola, Sarah (ACF) <Sarah.Viola@acf.hhs.gov>
**Sent:** Monday, November 1, 2021 12:32:38 PM
**To:** Matt Rueckert <matthew.rueckert@gmail.com>; Matt Rueckert <mrueckert@urbanstrategies.us>; Carla LaFayette <clafayette@urbanstrategies.us>; LCummins@UrbanStrategies.us <LCummins@UrbanStrategies.us>
**Cc:** johanna.umana@acf.hhs.gov <johanna.umana@acf.hhs.gov>; Gulbrandson, Jennifer (ACF) <Jennifer.Gulbrandson@acf.hhs.gov>; Leal, Bernadette (ACF) <Bernadette.Martinez@acf.hhs.gov>; Code, Karen (ACF) <Karen.Code@ACF.hhs.gov>; Jacobs Gainor, Rachel (ACF) <Rachel.Jacobs@acf.hhs.gov>; Antkowiak, Stephen (ACF) <Stephen.Antkowiak@acf.hhs.gov>
**Subject:** RE: CHS Transfer Check In

Matt-
Good morning! The potential federal replacement grant recipients, to continue to provide UC services through the grants relinquished by CHS, will be considered from among current UC grant providers. I will set up a meeting for this afternoon to discuss the status of these grants as well as the other existing Urban Strategies UC grant awards.

Thank you!

Sarah Viola, LICSW
Central Branch Senior Program Supervisor
Office of Refugee Resettlement
Division of Unaccompanied Children Operations
Office # 5214
Office: (202)401-4832
Cell Phone: (202) 420-8084
330 C ST SW mailroom 5123
Washington, DC 20201
Sarah.Viola@acf.hhs.gov

**From:** Matt Rueckert <matthew.rueckert@gmail.com>
**Sent:** Saturday, October 30, 2021 6:41 PM
**To:** Viola, Sarah (ACF) <Sarah.Viola@acf.hhs.gov>
**Cc:** Umana, Johanna (ACF) <Johanna.Umana@acf.hhs.gov>; Gulbrandson, Jennifer (ACF) <Jennifer.Gulbrandson@acf.hhs.gov>; Leal, Bernadette (ACF) <Bernadette.Martinez@acf.hhs.gov>; Code, Karen (ACF) <Karen.Code@ACF.hhs.gov>; Jacobs Gainor, Rachel (ACF) <Rachel.Jacobs@acf.hhs.gov>
**Subject:** RE: CHS Transfer Check In

Sarah,

I am emailing you for 2 reasons --

First, to let you know that I resigned as EVP/CFO at Urban Strategies after 11 years. My new position rests with MWR Solutions Group as the CEO.

Second, to take a pulse to see if ORR would consider transferring the Trail House program to MWR Solutions Group. The administrative team that started the transition with CHS remains intact under MWR Solutions Group. This is a strong and talented administrative team, which Trail House needs, that are fully on board and excited at the possibility of working with the Trail House program. There will also be some familiar staff on the proposed program team.

My commitment to ORR remains the same - a full transition of services from CHS by 1 December. My staff will be fully dedicated to this effort during the month of November and we'll make sure that there are no gaps in services. If acceptable by ORR, we will continue to proceed with the roadmap moving forward with the "transition in" tasks associated with Staffing, HR, CBA, Communications, Leases, IT, Vendors, etc. In order to continue with the on-site transition teams during the period of November 8-30, would ORR consider this proposal? If yes, I would only need a day to finalize and submit the Trail House application for review. As a footnote, the budget can be revised with a focus on maximizing tender age.

I understand there are hurdles that have to be cleared based on what I'm proposing but it's worth the ask.

I appreciate your consideration.

Thanks,
Matt

**From:** Viola, Sarah (ACF) <Sarah.Viola@acf.hhs.gov>
**Sent:** Friday, October 29, 2021 12:17 PM
**To:** Matt Rueckert <mrueckert@urbanstrategies.us>
**Cc:** johanna.umana@acf.hhs.gov; Guibrandson, Jennifer (ACF) <Jennifer.Guibrandson@acf.hhs.gov>; Leal, Bernadette (ACF) <Bernadette.Martinez@acf.hhs.gov>; Code, Karen (ACF) <Karen.Code@ACF.hhs.gov>; Jacobs Gainor, Rachel (ACF) <Rachel.Jacobs@acf.hhs.gov>
**Subject:** CHS Transfer Check In

Good afternoon! Thank you all for the diligent work on the replacement grant process for the current CHS grants. The budget reviews are anticipated to be completed by Monday November 1, 2021 and the PO team will continue to work with you regarding the staffing and capacity plan through November.

Please let me know if there are any concerns, questions or issues with the next steps and process.

Thank you
Sarah

Sarah Viola, LICSW

Central Branch Senior Program Supervisor

Office of Refugee Resettlement

Division of Unaccompanied Children Operations

Office # 5214

Office: (202)401-4832

Cell Phone: (202) 420-8084

## EXHIBIT J

**From:** Viola, Sarah (ACF) <Sarah.Viola@acf.hhs.gov>
**Sent:** Friday, November 5, 2021 4:25 PM
**To:** Lisa Cummins <lisacummins@urbanstrategies.us>; Carla LaFayette <clafayette@urbanstrategies.us>
**Cc:** Jacobs Gainor, Rachel (ACF) <Rachel.Jacobs@acf.hhs.gov>; johanna.umana@acf.hhs.gov; Gulbrandson, Jennifer (ACF) <Jennifer.Gulbrandson@acf.hhs.gov>; Leal, Bernadette (ACF) <Bernadette.Martinez@acf.hhs.gov>; Code, Karen (ACF) <Karen.Code@ACF.hhs.gov>; Wall, Jonathan (HHS/OGC) <Jonathan.Wall@hhs.gov>; Antkowiak, Stephen (ACF) <Stephen.Antkowiak@acf.hhs.gov>
**Subject:** CHS Replacement Grant Process

Good afternoon!

ORR greatly appreciates your dedication to providing care for unaccompanied children. Given the sudden changes in Urban Strategies' administrative capacity and structure, at this time, ORR is asking for Urban Strategies to cease all activities in support of becoming a replacement recipient for grant # ☒☒☒☒☒ Trail House. Through this process, it's become evident that the challenges associated with a program the size and complexity of the Trail House site may be more successfully taken on by a recipient that has experience with large capacity facilities.

ORR would like you to continue with the replacement process with grant # ☒☒☒☒☒

Please let us know if you have any other questions.

Thank you
Sarah

Sarah Viola, LICSW
Central Branch Senior Program Supervisor
Office of Refugee Resettlement
Division of Unaccompanied Children Operations
Office # 5214
Office: (202)401-4832
Cell Phone: (202) 420-8084
330 C ST SW mailroom 5123
Washington, DC 20201
Sarah.Viola@acf.hhs.gov